1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11

CHARLES EDWARD SHIPMAN,

Case No.:  15-cv-1451 BAS (BGS)

12

Petitioner,

13

v.

**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS**

14

SCOTT KERNAN, Secretary,[1]

15

Respondents.

16
17

## I.   <u>INTRODUCTION</u>

18

Petitioner Charles Edward Shipman, a state prisoner proceeding pro se, has filed a

19

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition") challenging

20

his convictions in San Diego County Superior Court Case No. SCD239448 for attempted

21

robbery and robbery.  (Pet., ECF No. 12.)[2]  Shipman raises three claims in the petition he

22

has filed in this Court.

23

/ / /

24

_____

25

[1] The Court hereby sua sponte substitutes the current Secretary of the California Department of Corrections and Rehabilitation, Scott Kernan, in place of Jeffrey Beard, who previously held that

26

position.  *See Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 894 (9th Cir. 1996) (stating that the respondent in § 2254 proceedings may be the chief officer in charge of state penal institutions).

27

[2] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted

28

by the Court's electronic case filing system, except for lodgments.

The Court has read and considered the Petition [ECF No. 1], the Answer and Memorandum of Points and Authorities in Support of the Answer [ECF No. 10], the lodgments and other documents filed in this case, and the legal arguments presented by both parties.  For the reasons discussed below, the Court recommends the Petition be **DENIED**.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are taken from the California Court of Appeal opinion:

> In October 2011, John Lux worked as a restaurant parking lot attendant in the Hillcrest neighborhood of San Diego.  At about 5:00 p.m. on October 23, while it was still daylight, Shipman approached Lux and asked him for a light.  Lux handed him some matches.  Shipman complained that his car had been towed from across the street.  Lux gave him the police telephone number and Shipman appeared to make a call on his cell phone.  After his call, Shipman remained in the parking lot and talked to Lux.  He told Lux that he was a Marine stationed at Camp Pendleton and worked with munitions.  Shipman stated there were munitions in his car and that he had a firearm on him.  About 20 to 25 minutes later, Shipman walked away.
>
> At about 8:30 p.m., Shipman suddenly reappeared next to Lux, shocking him.  Shipman stated, "Give me the money," then reached inside Lux's left front pocket and took $150.  Shipman had seen earlier where Lux kept his money.  Lux recognized Shipman from his conversation with him earlier that evening.  Shipman ordered him to lie face-down on the ground, and Lux complied.  After Shipman left, Lux went into the back of the restaurant and told someone he had been robbed.  A man called 911 for him.
>
> At about 6:30 p.m. on December 16, 2011, Shipman returned to the same parking lot and again robbed Lux while he was working.  Shipman

stated, "Give me the money," and reached inside Lux's pocket where the money had previously been located. However, Lux no longer kept his money in this pocket. Shipman put his hand in his jacket pocket, gestured as if he had a gun, and said that he would shoot Lux if he did not give him the money. Lux took money from a box in the attendants' booth and handed about $50 to Shipman. When Shipman asked him whether there was more money or whether he had a wallet, Lux replied, "No." Shipman told Lux to lie face-down as before. Later, during a 911 call, Lux reported the same person who robbed him on October 23 had robbed him again.

At about 7:00 p.m., on December 16, Katilee Fender was working as a clerk at a store in the North Park neighborhood of San Diego. She was closing the store when Shipman walked in. She told him the store was closed and he replied, "Good. This is a robbery. Give me all the money in the register." He gestured with his hand in his pocket and told her he had a gun and would shoot her if she looked at him. Fender gave him the money from two registers. Shipman demanded the money in the boxes on the floor, came around the counter, and pointed to the boxes. Shipman told her: "Don't look at me. Give me the money. I'll kill you." Fender opened the boxes and gave him the change from the change box. She gave him more than $700. He told her to lie face-down on the floor and count to 100. After Shipman left, she got up and called 911. Fender recognized Shipman's face because he had come into the store on four to eight prior occasions and bought a single piece of incense each time.

At about 8:30 p.m. on February 13, 2012, Jessica Benjamin was working at the Five and Dime General Store in Old Town when Shipman asked her for changed for a quarter. Benjamin got the register key from her supervisor, opened the register, and made the change. As she was closing the register, Shipman demanded that she give him "the money in the drawer." She replied, "no," and began to walk out from behind the counter. Shipman came around the counter and blocked her way. He had his hand in his jacket pocket and gestured as if he had a gun pointed at her. When Benjamin yelled her supervisor's name, Shipman backed away and stated, "I'm just playing you, I'm just playing." He asked for his change and she handed it to him. He then left the store. The store's video surveillance cameras recorded the attempted robbery. [FN 2: The parties stipulated it was Shipman shown on the surveillance video recording.] . . . . [FN 3: Because Shipman challenges only his three robbery convictions involving

/ / /

> Lux and Fender (i.e., counts three, four & five), we do not describe the factual background for the other counts.]

(Lodgment No. 5 at 3-5.)

## III.   **PROCEDURAL BACKGROUND**

On October 30, 2012, the San Diego County District Attorney's Office filed an Amended Information charging Charles Edward Shipman with six counts of robbery, a violation of California Penal Code (Penal Code) § 211 (counts two through seven) and one count of attempted robbery, a violation of Penal Code sections 211 and 664 (count one).  (Lodgment No. 1, vol. 1 at 0011-13.)  The Information also alleged that Shipman had suffered a prior conviction for which he had served a prison sentence, within the meaning of Penal Code sections 667.5(b) and 668.  (*Id.* at 0018.)  The Information also alleged that Shipman had suffered two prior serious felony convictions, within the meaning of Penal Code sections 667(a)(1), 668 and 1192.7, and that Shipman had suffered a prior "strike" conviction, within the meaning of Penal Code section 667(b) – (i), 1170.12, and 668.  (*Id.* at 0014.)

Following a jury trial, Shipman was convicted of counts one, three, four and five.  (Lodgment No. 2, vol. 8 at 743-45.)  The jury was unable to reach a verdict on counts two, six and seven.  (*Id.* at 745-46.)  A bench trial was held on the validity of the prior conviction allegations.  (Lodgment No. 2, vol. 9 at 752-63.)  Shipman was sentenced to 44 years plus 100 years-to-life in prison.  (Lodgment No. 2, vol. 10 at 771.)

Shipman appealed his convictions to the California Court of Appeal for the Fourth Appellate District, Division One.  (Lodgment Nos. 3-4.)  The state appellate court affirmed his convictions in a written opinion.  (Lodgment No. 5.)  Shipman then filed a petition for review in the California Supreme Court.  (Lodgment No. 6.)  The California Supreme Court denied the petition for review without citation of authority.  (Lodgment No. 7.)

Shipman filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on July 1, 2014.  (ECF No. 1.)  Respondent filed an Answer and Memorandum

in Support of the Answer on November 5, 2015.  (ECF No. 10.)  Shipman did not file a Traverse.

## IV. __DISCUSSION__

Shipman raises three claims in his Petition.  First, he claims his due process rights were violated when the trial court refused to exclude impermissibly suggestive pre-trial identifications and tainted in court identification by two of the victims.  (Pet. at 6-19.)  Second, Shipman contends the trial court improperly refused a defense-crafted pinpoint jury instruction on suggestive eyewitness identification.  (*Id.* at 20-30.)  Third, Shipman contends his trial counsel was ineffective for failing to object to the inclusion of the certainty of the eyewitness's identification as a factor in evaluating the accuracy of eyewitness identification in CALCRIM No. 315.  (*Id.* at 31-34.)  Respondent contends the state court's resolution of Shipman's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 5-15.)

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  See *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

/ / /

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

/ / /

B.  *Admission of Suggestive Identification*

Shipman argues his federal due process rights were violated when the trial court refused to exclude pre-trial identifications by victims Fender (count three) and Lux (counts four and five) as impermissibly suggestive.  He also contends the subsequent in-court identifications were tainted by the suggestive pretrial identifications and should also have been excluded.  (Pet. at 6-19.)  Respondent contends the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 9-12.)

Shipman raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 6.)  That court denied the petition without citation of authority.  (Lodgment No. 7.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  That court analyzed the claim as follows:

A.

San Diego Police Detective Mark Haas investigated the robberies of Lux and Fender, as well as other robberies that may have been committed by the same suspect.  In January 2012, he showed Lux and Fender a 10-pack photographic line-up that did not include Shipman's photograph.  Neither Lux nor Fender identified anyone in that photographic line-up.

In February 2012, Haas obtained the surveillance video recording of the attempted robbery at the Five and Dime General Store in Old Town and believed the suspect in that attempted robbery matched the description of the suspects in the other robberies he was investigating.  He created still photographs from the video recording and created a flyer that was distributed to law enforcement personnel for assistance in identifying the suspect shown in the photographs.  Haas showed Fender the flyer displaying three photographs of Shipman from the video recording.  Fender positively identified Shipman as the man who robbed her, stating, "That's him."  When Haas showed the flyer to Lux, Lux stated it was too hard for him to make a determination from the photographs.  [FN 4: Two days before showing Lux the video recording, Haas obtained information that a parole agent had identified Shipman as the man shown in the flyer's photographs.]  Haas asked Lux whether he thought viewing the surveillance

7

video recording would help, and Lux replied it would. After viewing the surveillance video recording, Lux stated he believed the man shown was the man who robbed him based on his "body style and demeanor," but that he was not positive. On a scale of one to 10, Lux's certainty that it was the same man was six out of 10.

After obtaining information that Shipman was the suspect in Benjamin's robbery, Haas created a six-pack photographic line-up that included a photograph of Shipman. Haas showed the photographic line-up to Benjamin, who immediately identified Shipman as the man who attempted to rob her.

The following day, police arrested Shipman. Shipman was wearing a black jacket similar to the one shown in the surveillance video recording of the Benjamin offense. During a search of his home, police found a gray sweatshirt in his closet. Fender identified the sweatshirt as similar to the one worn by the man who robbed her.

On March 7, 2012, police conducted a live line-up, consisting of Shipman and five other men. Lux attended the line-up and immediately identified Shipman when he walked out. His identification was confirmed when Shipman said the phrase, "Give me the money." Although Fender did not attend the live line-up, she later viewed a video recording of it and positively identified Shipman as the man who robbed her.

At Shipman's preliminary hearing, both Lux and Fender positively identified Shipman as the man who robbed them. Lux stated he was 100 percent certain of his identification.

Before trial, Shipman moved to exclude the pretrial identifications of him, arguing they were the result of unduly suggestive identification procedures. He argued the single suspect photographs and video recording, along with Haas's related statements, resulted in unduly suggestive identification procedures, and therefore the pretrial identifications by Lux and Fender should be excluded. He also claimed their expected trial identifications were tainted by the impermissible identification procedures and should also be excluded. The trial court tentatively ruled it was "inclined" to grant the motion in part to exclude the pretrial identifications by Lux and Fender based on the single suspect photographs and video recording because the procedures used were "probably suggestive," but would deny the motion in part to exclude the subsequent live line-up

identifications and in-court identifications by Lux and Fender, stating the live line-up appeared to be "very fair," and that under the totality of the circumstances their identifications were reliable.  Based on the court's tentative ruling, Shipman elected to have all of the identification evidence admitted so his expert witness could challenge its reliability.

During trial, all of the pretrial identification evidence was admitted and Lux and Fender identified Shipman in court as the man who robbed them.  They also testified regarding the robberies and their subsequent identifications of Shipman as the man who robbed them.  The jury found Shipman guilty of the two counts of robbery committed against Lux and the one count of robbery committed against Fender.

B.

An identification procedure is unfair if it "suggests in advance of identification by the witness the identity of the person suspected by the police." (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.)  Admission of eyewitness identification evidence may violate a defendant's constitutional due process rights if the identification procedures were "unnecessarily suggestive and conducive to irreparable mistaken identification . . . ." (*Stovall v. Denno* (1967) 388 U.S. 293, 302.)  The California Supreme Court stated:

> "[T]o determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was *unduly suggestive* and unnecessary, and, if so, (2) whether the identification itself was nevertheless *reliable under the totality of the circumstances*, taking into account such factors as the opportunity of the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989, italics added (*Cunningham*).)

In determining whether an identification procedure is unduly suggestive, "[t]he question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him [or her]." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.)  "The defendant

bears the burden of demonstrating the existence of an unreliable identification procedure." (*Cunningham*, at p. 989.) The question of whether an identification procedure is "unduly suggestive" for due process purposes is a mixed question of law and fact that we review de novo, or independently of the trial court's ruling. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-09.)

## C.

Shipman argues the showings of the single photographs to Lux and Fender and the single suspect video recording to Lux were unduly suggestive and tainted their subsequent identifications of him as the man who robbed them. However, contrary to Shipman's assertion, the showing of a single suspect photograph to a witness is not inherently unfair or unduly suggestive. (*People v. Ochoa* (1998) 19 Cal.4th 353, 411-413.) "Showing the witness a single photo of the defendant is not more *impermissibly* suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom." (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009.) Although that single suspect identification procedure generally is not the ideal or preferred method and "may pose a danger of suggestiveness," it is not necessarily or inherently unfair. (*People v. Clark* (1992) 3 Cal.4th 41, 136.) We look at the totality of the circumstances in determining whether a particular single suspect identification procedure is unduly suggestive. (*Ibid*.)

. . . .

Assuming arguendo the identification procedures used with Lux were unduly suggestive, we nevertheless would conclude, based on our review of the totality of the circumstances, that Lux's identification of Shipman as the man who robbed him was reliable. Before Lux was robbed the first time, he had an extended period of time (20 to 25 minutes) during which to observe Shipman nearby in the parking lot. Lux conversed with Shipman and even handed him some matches. Therefore, Lux had ample opportunity prior to the first robbery to observe Shipman and, when he was robbed a few hours later, recognized him from that earlier encounter. Lux's ability to identify Shipman was further enhanced when Shipman robbed him a second time two months later. During a 911 call, Lux stated that the man who had robbed him was the same man who had robbed him before. Therefore, Lux clearly remembered the appearance of the man who robbed him the first time. When Lux ultimately identified Shipman as the man

who robbed him after viewing the surveillance video recording and the subsequent live line-up, Lux had a strong foundation on which to identify him based on multiple opportunities to observe Shipman's appearance and mannerisms. Likewise, Lux's attention at the time of both robberies presumably was more than sufficient for him to remember Shipman's appearance. In particular, during the second robbery Lux recognized Shipman as the man who robbed him the first time. Furthermore, during the live line-up Lux identified Shipman "right away" and had "no doubt" he was the man who robbed him. Finally, the lapse of time between the two robberies and Lux's identification of Shipman was only a few months and therefore probably did not significantly affect his memory of the appearance of the man who robbed him twice. Under the totality of the circumstances, we conclude Lux's identification of Shipman as the man who robbed him was reliable. (*Cunningham*, *supra*, 25 Cal.4th at p. 989.) The admission of evidence of Lux's identification of Shipman did not violate Shipman's constitutional due process rights. (*Ibid*.)

. . . .

[A]ssuming arguendo the identification procedures used with Fender were unduly suggestive, we nevertheless would conclude, based on our review of the totality of the circumstances, that her identification of Shipman as the man who robbed her was reliable. Before Fender was robbed, she had multiple opportunities to observe him. She testified that she had seen Shipman as a customer in the store between four and eight times and remembered him because each time he would buy a single piece of incense. When Shipman robbed her, Fender recognized him from her prior encounters with him in the store. When Fender positively identified Shipman as the man who robbed her after viewing the three photographs from the surveillance video recording and after viewing the video recording of the subsequent live line-up, she had a strong foundation on which to identify him based on multiple opportunities to observe Shipman's appearance and mannerisms. Likewise, Fender's attention at the time of the robbery presumable was more than sufficient for her to remember Shipman's appearance from those prior encounters as well as from the robbery. Finally, the lapse of time between the robbery and Fender's identification of Shipman was only two months and therefore probably did not significantly affect her memory of the appearance of the man who robbed her. Under the totality of the circumstances, we conclude Fender's identification of Shipman as the man who robbed her was reliable. (*Cunningham*, *supra*, 25 Cal.4th at p. 989.) Therefore, the admission of

evidence of Fender's identification of Shipman did not violate Shipman's constitutional due process rights.  (*Ibid.*)

(Lodgment No. 5 at 5-16)

The Supreme Court has noted that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716, 724 (2012).  Even if the pretrial identification procedures were unduly suggestive and unnecessary, "suppression of the resulting identification is not the inevitable consequence." *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 112-13 (1977) and *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972)).  Rather, courts are to evaluate the reliability of an eyewitness's identification on a case-by-case basis considering the totality of the circumstances.  *Id.* at 724-25.  The Ninth Circuit has described the clearly established Supreme Court law regarding suggestive identifications in this way:

> To determine whether an identification procedure violates a defendant's due process rights, a court must consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).  The "factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id*. at 199-200, 93 S.Ct. 375; *see also United States v. Jones*, 84 F.3d 1206, 1209–10 (9th Cir. 1996).

*United States v. Drake*, 543 F.3d 1080, 1088 (9th Cir. 2008).

The state appellate court properly analyzed Shipman's pretrial identification using the factors outlined in *Neil*.  As the state appellate court noted, Lux had an extensive "opportunity to view the criminal at the time of the crime" because he talked to the individual who robbed him for about 20-25 minutes before the individual left, then returned to rob him.  (Lodgment No. 5 at 12; Lodgment No. 2, vol. 5 at 330.)  It was still light outside when the individual was talking to Lux.  (Lodgment No. 2, vol. 5 at 336.)

Lux also had a second opportunity to view the robber when he was robbed a second time by a person Lux identified as the man who robbed him the first time. (Lodgment No. 5 at 13; Lodgment No. 2, vol. 5 at 342.)  The state court properly noted that Lux's recognition that the individual who robbed him the second time was the same individual who robbed him the first time, established that Lux's "degree of attention" was significant. (Lodgment No. 5 at 13.)  Lux's "degree of attention" was also established by his statement that while he was talking to the individual who later robbed him, he was "keeping a pretty close eye" on him because the individual told Lux he had a gun on him. (Lodgment No. 2, vol. 5 at 330, 337.)

Lux's prior description of the robber was also relatively accurate.  *See Neil*, 409 U.S. at 199-200.  Lux described the robber as a Black man, 35 or 40 years old, 6 feet 3 inches tall, "lean, not thin, just kind of like regularly built, 170 to 190 pounds. (Lodgment No. 1, vol. 1 at 0170-72.)  According to a booking photo taken of Shipman in 2006, Shipman is a Black male, 6 feet 1 inch tall, weighed 200 pounds, and would have been 48 years old at the time of Lux's robbery.  (Lodgment No. 1, Supp. Clerk's Transcript at 0040.)  And, Lux's level of certainty in his identification was also strong. *See Neil*, 409 U.S. at 199-200.  Lux testified that as soon as Shipman walked into the room during the live line-up, which was conducted three months after the last robbery, he had "no doubt" that Shipman was the individual who robbed him.  (*Id.* at 349.)  Lux identified Shipman as the robber during a preliminary hearing and was 100% certain that the identification he made then was correct.  (*Id.* at 351.)  Finally, his lineup identification of Shipman occurred about three months after the second robbery and Lux was sure the person who robbed him the second time was the same individual who robbed him the first time.  (Lodgment No. 2, vol. 5 at 342, 387.)  Thus, the length of time between the crime and the confrontation, while not immediate, was relatively short.  *See Neil*, 409 U.S. at 199-200.

The state appellate court also correctly analyzed Fender's identification of Shipman using the *Neil* factors.  As the state court noted, Fender had a good opportunity

to view the robber. *See Neil*, 409 U.S. at 199-200. She was able to observe the robber as he walked toward her from the back of the store. Fender recognized the robber from the four to eight prior occasions he had been in the store buying incense. (Lodgment No. 2, vol. 5 at 264-66.) Fender's degree of attention was heightened as there were no other customers in the store and she talked with him briefly in an attempt to dissuade him from robbing her. (*Id.* at 264-65.) Fender's prior description of the robber was similar to Lux's and was likewise relatively accurate. *Neil*, 409 U.S. at 199-200. She described the robber as a Black male in his early to late 40's, bald, about six feet tall with a medium build. (Lodgment No. 1, vol. 1 at 0151.) As noted above, a booking photo taken of Shipman in 2006 shows Shipman is a Black male, 6 feet 1 inch tall, weighed 200 pounds, and would have been 48 years old at the time of the robbery. (Lodgment No. 1, Supp. Clerk's Transcript at 0040.) Fender was also certain about her identification. *See Neil*, 409 U.S. at 199-200. Upon viewing the videotape of the live line-up, Fender "immediately" knew Shipman was the robber because she remembered "exactly what he looked like." (Lodgment No. 2, vol. 5 at 275.) Fender was also "absolutely certain" of her identification of Shipman at the preliminary hearing. (*Id.* at 276.) Finally, Fender's identification of Shipman from the videotape of the live lineup and her identification of Shipman at the preliminary hearing occurred about three months after the robbery. (*Id.* at 284.) Like Lux's identification, though not immediately after the event, the length of time between the robbery and the identification was relatively short.

In sum, even if the police procedures used to secure Lux and Fender's identification of Shipman were suggestive, their identifications at the live lineup and in court were nevertheless reliable and admissible. "It is the likelihood of misidentification which violates a defendant's right to due process . . . ." *Neil*, 409 U.S. at 381-82. Here, as the state appellate court correctly concluded after applying the factors outlined in *Neil*, the likelihood of misidentification was slim. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. It was also not based on an

1   unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Thus, Shipman is not

2   entitled to relief as to this claim.

3       C.   *Jury Instruction Error*

4       Next, Shipman argues his due process rights were violated when the trial court

5   refused to give a pinpoint jury instruction which told the jury his pretrial identifications

6   were unduly "tainted by suggestive police procedures" and gave a jury instruction that

7   told the jury they could consider the witness's certainty of his or her identification in

8   determining the accuracy of the witness's identification.  (Pet. at 20-29.)  Respondent

9   contends the state court's resolution of this claim was neither contrary to, nor an

10  unreasonable application of, clearly established Supreme Court law.  (Answer at 12-14.)

11      1.   *Pinpoint Instruction*

12      Shipman contended in pretrial motions that the line-up and in-court identifications

13  made by witnesses Lux and Fender were tainted by unduly suggestive pretrial

14  identifications.  (Lodgment No. 1, vol. 1 at 24-63; Lodgment No. 2, vol. 2 at 1-91.)

15  Following a hearing, the trial court stated as follows:

16      [THE COURT]: So this is what I'm thinking:  I think that the – just

17  showing the one photo and the video to the three witnesses, Fender,
    Yanez, Lux – is probably suggestive.  It's not curbside.  It's not

18  immediately after the crime has occurred.  So that's where I'm leaning.

19      I think that the lineup appeared to be very fair to the Court.  There

20  was an admonishment given to all of the witnesses.  So I think that that is
    fine.  I read the prelim transcript, and it looks like the identifications at the

21  prelim also appear to be fine.

22
23      So I'm inclined not to allow the identification with just the photo and
    the video that was shown without the full transcript.  So that's where I'm

24  going.

25  (Lodgment No. 2, vol. 2 at 84.)

26      Defense counsel then told the trial judge that given the court's ruling she would

27  ask to admit the pretrial identifications in order to present expert testimony on eyewitness

28  identification and her defense that the pretrial identification procedures were suggestive

and the subsequent lineup and in-court identifications were tainted by the pretrial identifications. (*Id.* at 86.)  The court noted that defense counsel in such situations "can ask the Court to instruct the jury that the identification procedure was tainted, and even if this is not allowed, Counsel can introduce the same evidence before the jury that was introduced at the identification hearing and may persuade jurors that the identification is wrong." (*Id.* at 87.)  Defense counsel was instructed to consider her options and make a decision as to how she wanted to proceed. (*Id.*)  After a recess and further argument, the trial judge made her final ruling, stating that "given what the People showed the Court this morning, that that constitutes clear and convincing evidence under the totality of the circumstances here." (*Id.* at 90.)  When asked to explain, the trial judge stated that once the court concludes the identification was suggestive, "the burden shifts to the prosecution to prove by clear and convincing evidence that the in-court identification was based on observations at the scene and was not tainted by the procedure." (*Id.* at 90.)  The trial judge indicated further that, under the totality of the circumstances, and considering the factors outlined in *Neil*, the in-court identifications were reliable. (*Id.* at 90-91.)  Defense counsel then elected to have all the identifications admitted. (*Id.* at 91.)

During discussion on jury instructions, defense counsel sought to have a pinpoint instruction given to the jury based on her understanding of the court's ruling on the identifications. (Lodgment No. 2, vol. 4 at 209.)  The proposed instruction read as follows:

> The defendant contends that HAYDEE YANEZ, KATILEE FENDER, and JOHN LUX mistakenly identified him because, among other factors, their initial identification of Mr. Shipman via the surveillance video was tainted by unduly suggestive police procedures.
>
> The Court has already determined that those three initial identifications were, in fact, tainted.  You should consider these initial identifications with caution and you may consider this when determining the accuracy of these witnesses' subsequent identifications.

> If you have a reasonable doubt about whether or not these three witnesses' identification of Mr. Shipman as the perpetrator was accurate, you must find the defendant not guilty on those counts.

(Lodgment No. 1, vol. 1 at 84.)

Following argument, the trial judge agreed that the defense was entitled to a pinpoint instruction on the theory of the defense, but was uncomfortable with the language in the instruction submitted by the defense. (Lodgment No. 2, vol. 4 at 209-15.) Instead, the trial judge decided to modify an existing instruction, CALCRIM No. 315, to include language about suggestive identification. (Lodgment No. 2, vol. 7 at 647-51.) CALCRIM No. 315, as read to the jury, states as follows:

> You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.
>
> In evaluating identification testimony, consider the following question:
>
> - Did the witness know or have contact with the defendant prior to the event?
> - How well could the witness see the perpetrator?
> - What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?
> - How closely was the witness paying attention?
> - Was the witness under stress when he or she made the observation?
> - Did the witness give a description and how does that description compare to the defendant?
> - How much time passed between the event and the time when the witness identified the defendant?
> - Was the witness asked to pick the perpetrator out of a group?
> - Did the witness ever fail to identify the defendant?
> - Did the witness ever change his or her mind about the identification?
> - How certain was the witness when he or she made an identification?
> - Are the witness and the defendant of different races?

- Was the witness able to identify the defendant in a photographic or physical lineup?
- Were any of the identification procedures unduly suggestive?
- Did the witness ever identify someone else as the perpetrator?
- Were there any other circumstances affecting the witness's ability to make an accurate determination?

The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find that the defendant is not guilty.

(Lodgment No. 1, vol. 1 at 0077-78.)

Shipman contends that the defense proposed pinpoint instruction should have been given and not the modified CALCRIM No. 315 which included as a factor the suggestiveness of the identification procedures.  (Pet. at 20-30.)  Respondent does not address this claim in the Answer.

Shipman raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 6.)  That court denied the petition without citation of authority.  (Lodgment No. 7.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  That court analyzed the claim as follows:

A.

Although a trial court must instruct on general principles of law relevant to the issues raised by the evidence (*People v. St. Martin* (1970) 1 Cal.3d 524, 531), the court must "refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.'" (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)  Likewise, although a criminal defendant "is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1120), an instruction regarding the effects of such factors "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert

testimony where appropriate." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143, fn. omitted.)

B.

We conclude the trial court property refused to instruct with Shipman's proposed pinpoint instruction. First, that proposed instruction was inaccurate because the trial court did *not*, as Shipman asserts, "determine" that the initial identifications by Lux and Fender "were, in fact, tainted." Rather, as we stated above, the court tentatively ruled only that it was "inclined" to grant Shipman's motion to exclude the pretrial identifications by Lux and Fender based on the single suspect photographs and surveillance video recording because the procedures used were "probably suggestive." It did *not* conclude those pretrial identifications were "tainted" or, alternatively stated, the result of unduly suggestive identification procedures.

Second, Shipman's proposed pinpoint instruction was argumentative because it invited the jury to draw inferences favorable to him from specific evidence. His proposed instruction argued, in effect, that because the trial court had found Lux's and Fender's initial identifications tainted, the jury should adopt his defense theory that Lux and Fender mistakenly identified him. Because the proposed pinpoint instruction was both inaccurate and argumentative, the trial court properly refused to give it.

Furthermore, Shipman has not carried his burden on appeal to show the trial court erred by modifying CALCRIM 315 to add the suggestiveness of identification procedures as a factor in the jury's evaluation of identification testimony (i.e., "[w]ere any of the identification procedures unduly suggestive?"). Although the term "unduly suggestive" is used, as discussed above, in a court's determination of the admissibility of identification evidence and therefore has a legal definition in that context, there is nothing in the court's modified version of CALCRIM No. 315 indicating, and Shipman does not persuade us, the jury needed to know and/or apply that legal definition of the term "unduly suggestive" in that context. Rather, the jury presumably applied the common lay meaning of that term, based on the expert testimony at trial regarding eyewitness identification, to the evidence in this case in evaluating the identification evidence and reaching its verdicts finding Shipman guilty on counts three, four and five.

(Lodgment No. 5 at 16-18.)

1    Instructional error can form the basis for federal habeas corpus relief only if it is

2    shown that "'the ailing instruction by itself so infected the entire trial that the resulting

3    conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d

4    926, 971 (9th Cir. 2001) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973));

5    *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The allegedly erroneous jury instruction

6    cannot be judged in isolation, however.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

7    Rather, it must be considered in the context of the entire trial record and the instructions

8    as a whole.  *Id.*  Where a petitioner's alleged due process violation rests on the failure to

9    give an instruction, the petitioner's burden is a particularly heavy one, as an "omission, or

10   an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

11   *Henderson*, 431 U.S. at 155.  A petitioner's due process rights may be violated, however,

12   when a trial court refuses to give a requested instruction on a theory of defense if

13   substantial evidence was presented to support that defense.  *Bradley v. Duncan*, 315 F.3d

14   1091, 1098–1100 (9th Cir. 2002).  A defendant is not entitled to a specific instruction so

15   long as other instructions adequately inform the jury of the defense theory of a case.

16   *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

17       The instructions given to the jury adequately alerted them to Shipman's defense

18   theory and provided them a framework within which to apply it.  CALCRIM No. 315

19   told the jury to consider several factors in its evaluation of eyewitness testimony, one of

20   which was "[whether] any of the identification procedures unduly suggestive."

21   (Lodgment No. 1, vol. 1 at 0078.)  The terms "suggestive" and "unduly suggestive" were

22   discussed and explained by the defense experts during their testimony about suggestive

23   police identification procedures.  (Lodgment No. 2, vol. 6 at 516-26, vol. 7 at 630-33.)

24   The terms are also relatively common ones that a juror could apply using his or her own

25   common sense.  Moreover, there was extensive expert testimony presented about the

26   pitfalls of eyewitness testimony and the suggestive nature of the police procedures used

27   in Shipman's case.  (*See* Lodgment No. 2, vol. 6 at 497-598 [testimony of Dr. Mitchell

28   Eisen, Ph.D.]; vol. 7 at 616-39 [testimony of Dr. Thomas Streed, Ph.D.].)  Detective Haas

was also thoroughly cross-examined regarding the techniques he used to conduct the identification of Shipman and how and whether those techniques violated police procedures.  (Lodgment No. 2, vol. 6 at 401-33.)  In addition the instruction reiterated that the prosecution had the burden of proving that is was Shipman who committed the crime.  (*Id*.) And defense counsel's closing argument forcefully focused the jury's attention on the identification issue.  (Lodgment No. 2, vol. 7 at 701-15.)

In any event, jury instruction error is subject to harmless error analysis, that is, if error is found, relief can only be granted if it had a substantial and injurious effect on the jury's verdict.  *California v. Roy*, 519 U.S. 2, 6 (1996); *Brecht v. Abrahamson*, 507 U.S. 637 (1993).  The jury's failure to reach a verdict on three of the robbery counts indicates they understood the defense theory and the problems with the eyewitness identifications of Shipman and that, to a degree, they believed them.  (*See* Lodgment No. 1, vol. 1 at 242-47 [jury notes and verdicts].)  The additional language in the pinpoint instruction would not have added to the jury's understanding of these issues in a meaningful way, nor is it reasonably likely to have changed the outcome of the case.

Accordingly, and for the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Shipman is not entitled to relief as to this claim.

2.   *Inclusion of Certainty of the Witnesses' Identification as a Factor in CALCRIM No. 315*

Shipman also contends that CALCRIM 315 violated his due process rights because it includes "certainty of the witness's identification" as one of the factors the jury may consider in determining whether the eyewitness accurately identified the perpetrator. (Pet. at 20-30.)  Shipman argues the current scientific understanding of eyewitness testimony is that the certainty of a witness's identification bears no relationship to the accuracy of a witness's identification of a criminal.  (*Id.*)  Respondent argues the state

court properly resolved this claim and its denial was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 12-15.)

Shipman raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 6.)  That court denied the petition without citation of authority.  (Lodgment No. 7.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  That court analyzed the claim as follows:

*CALCRIM No. 315*

Shipman contends the trial court erred by instructing the jury with a version of CALCRIM No. 315 that included the certainty of the witness's identification as a factor in evaluation the accuracy of the identification.

. . . .

Assuming arguendo that Shipman did not waive his contention by not objecting below to the trial court's instruction with CALCRIM No. 315, we nevertheless conclude the court properly instructed that a witness's certainty of his or her identification may be considered by the jury in evaluating that witness's identification testimony.  As Shipman notes, CALJIC No. 2.92, a predecessor to CALCRIM No. 315, was upheld in *People v. Johnson*, *supra*, 3 Cal.4th at pages 1230 to 1232.  (See also *People v. Wright*, *supra*, 45 Cal.3d at pp. 1141–1143 [approving CALJIC No. 2.92, which included the certainty factor at that time].)  When *Johnson* was issued, CALJIC No. 2.92 included among the factors the jury should consider in evaluating eyewitness identification testimony " '[t]he extent to which the witness was either certain or uncertain of the identification.' " (*Johnson*, at pp. 1230–1231, fn. 12.)  *Johnson* rejected the defendant's contention that the trial court erred in instructing the jury that the extent to which the witness was either certain or uncertain of the identification was a factor to consider in assessing eyewitness identification testimony.  (*Id*. at pp. 1231–1232.)

Although Shipman correctly notes *Johnson* did not expressly address the question of whether inclusion of the certainty factor violated the federal and/or California Constitutions, we nevertheless presume the California Supreme Court would not have approved that instruction were it

22

constitutionally infirm.  Furthermore, other cases issued after *Johnson* have rejected the argument Shipman makes in this appeal.  (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 561-562; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303.)  *Sullivan* stated: "As in *Gaglione*, we therefore 'reject defendant's arguments and find no error in CALJIC No. 2.92' as given with reference to degree of certainty as a factor in assessing the reliability of eyewitness identification testimony." (*Sullivan*, at p. 562.) We believe those cases' conclusions regarding the witness certainty factor in CALJIC No. 2.92 should likewise be applied to the trial court's instruction with CALCRIM No. 315 in this case.  CALCRIM No. 315 does not require a jury to consider a witness's certainty or uncertainty.  It does not make any correlation between the witness's level of certainty and accuracy of his or her identification.  It does not imply witnesses are more believable if they are certain of their identifications.  Rather, CALCRIM No. 315 properly permits a jury to consider an eyewitness's certainty at the time of his or her identification.  We conclude the trial court did not err by instructing that a witness's certainty of his or her identification may be considered by the jury in evaluating that witness's identification testimony.

Shipman has not cited any California case that held erroneous, whether as a violation of the federal and/or California Constitutions or otherwise, an instruction that witness certainty is a factor in the jury's evaluation of identification testimony.  His citations to cases from other jurisdictions and psychology journal articles do not persuade us to reach a contrary conclusion.  (See, e.g., *State v. Long* (Utah 1986) 721 P.2d 483; *Brodes v. State* (Ga. 2005) 614 S.E.2d 766.)

(Lodgment No. 5 at 16-21.)

CALCRIM No. 315 is consistent with Supreme Court law on the issue of eyewitness identification.  The instruction did not tell jurors that certainty of the witness was dispositive of the accuracy of the identification, only that it was a factor for them to consider.  The Supreme Court in *Neil* specifically identified certainty of the witness as a factor to be considered in the evaluation of eyewitness testimony.  *Compare*, CALCRIM No. 315 (directing jurors to consider, in their evaluation of eyewitness testimony, "how well could the witness see the perpetrator," "what were the circumstances affecting the witness's ability to observe?", "how closely was the witness paying attention?", "did the witness give a description and how does that description compare to the defendant?",

1    "how certain was the witness when he or she made an identification?", and "how much

2    time passed between the event and the time when the witness identified the defendant?",

3    *with Neil*, 409 U.S. at 199- 200 ("the factors to be considered in evaluating the likelihood

4    of misidentification include the opportunity of the witness to view the criminal at the time

5    of the crime, the witness' degree of attention, the accuracy of the witness' prior

6    description of the criminal, the level of certainty demonstrated by the witness at the

7    confrontation, and the length of time between the crime and confrontation.")  Shipman

8    has cited no clearly established Supreme Court law that contradicts *Neil*.  Accordingly,

9    the state court's denial of this claim was neither contrary to, nor an unreasonable

10   application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

11   Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

12   Shipman is not entitled to relief as to this claim.

13        D.  *Ineffective Assistance of Counsel*

14       Shipman states his final claim as follows:  "If any aspect of argument 2 is deemed

15   waived or forfeited for failure to object to the inclusion of certainty as a factor in the

16   eyewitness instruction, then petitioner received ineffective assistance of counsel . . . ."

17   (Pet. at 52.)  Respondent counters that counsel cannot be ineffective for failing to make

18   an unmeritorious objection.  (Answer at 14-15.)

19       Shipman raised this claim in the petition for review he filed in the California

20   Supreme Court.  (Lodgment No. 6.)  That court denied the petition without citation of

21   authority.  (Lodgment No. 7.)  Accordingly, this Court must "look through" to the state

22   appellate court's opinion denying the claim as the basis for its analysis.  That court

23   analyzed the claim as follows:

24         Shipman contends he was denied his constitutional right to effective
        assistance of counsel when his counsel did not object to the trial court's

25      instruction with CALCRIM No. 315 that included witness certainty as a

26      factor for the jury to consider in evaluating eyewitness identification
        testimony.  However, because we concluded above that the court did not

27      err by so instructing, his counsel's not objecting to that instruction cannot

28      be prejudicial because it is not reasonably probable Shipman would have

1
2
3

obtained a more favorable result had his counsel timely objected to that instruction.  (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *Cunningham*, *supra*, 25 Cal.4th at p. 1003.)  We conclude Shipman was not denied his constitutional right to effective assistance of counsel.

4

(Lodgment No. 5 at 21-22.)

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  He must also show he was prejudiced by counsel's errors.  *Id.* at 694.  Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).  Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential."  *Strickland*, 466 U.S. at 689.  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Id.* at 686-87.  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one.  *Id.* at 697.

20
21
22
23
24
25
26
27
28

"Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so."  *Harrington v. Richter*, 562 U.S.86 (2011) (citations omitted).  These standards are "difficult to meet" and "demand[] that state court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979).  "Representation is constitutionally ineffective

only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

As the state court correctly concluded, there was no valid legal basis upon which counsel could have objected to the inclusion of the witness's degree of certainty in the CALCRIM No. 315 instruction because both California and Federal law permit the witness's degree of certainty to be considered by jurors. *See People v. Sullivan*, 151 Cal. App. 4th 524, 561-62 (2007) (stating that the argument to exclude witness certainty from the factors a jury is to consider in evaluating eyewitness testimony was "'expressly rejected' in *People v. Wright*, 45 Cal. 3d 1126, 248 (1988), [which held] that 'a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should not take a position as to the impact of each of the psychological factors listed.' (Italics omitted.)"); *Neil*, 409 U.S. at 199-200 (expressly including certainty of a witness's identification as a factor to consider in assessing the accuracy of eyewitness testimony).

For the same reason, Shipman has not established he was prejudiced by any error by counsel. *Strickland*, 466 U.S. at 694. There is no reasonable probability that, even if counsel had objected to CALCRIM No. 315's inclusion of witness certainty that the trial judge would have altered the jury instruction. *Id.*

The state court's denial of this claim was neither contrary to, nor a reasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2) Accordingly, Shipman is not entitled to relief as to this claim.

## V.   **CONCLUSION**

The Court submits this Report and Recommendation to United States District Judge Cynthia A. Bashant under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California.

1   Further, IT IS HEREBY RECOMMENDED that the Court issue an order: (1)
2   approving and adopting this Report and Recommendation, and (2) directing that
3   Judgment be entered DENYING the Petition for Writ of Habeas Corpus.

4   IT IS ORDERED that no later than **March 18, 2016** any party to this action may
5   file written objections with the Court and serve a copy on all parties. The document
6   should be captioned "Objections to Report and Recommendation."

7   IT IS FURTHER ORDERED that any reply to the objections shall be filed with the
8   Court and served on all parties no later than **April 8, 2016**. The parties are advised that
9   failure to file objections within the specified time may waive the right to raise those
10  objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th
11  Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

12  **IT IS SO ORDERED.**

14  Dated: February 29, 2016

15  Hon. Bernard G. Skomal
16  United States Magistrate Judge

27

15-cv-1451 BAS (BGS)